[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 280 
Rowena S. Van Hoof ("Mrs. Van Hoof) appeals from a judgment entered by the Mobile Circuit Court in favor of Gaynell M. Van Hoof ("Gaynell"), one of her daughters, following a bench trial (appeal no. 1051221). Gaynell cross-appeals from a summary judgment entered by the Mobile Circuit Court in favor of Robert E. Burton, Burton Associates, [1] and Cadaret, Grant Company, Inc. ("Cadaret") (appeal no. 1051432). In the appeal, we affirm the judgment; in the cross-appeal, we affirm the judgment in part and we reverse it in part.
 I. Facts and Procedural History
Mrs. Van Hoof and her husband had four children: James, Lynda, Rowena, and Gaynell. In August 1983, after 40 years of marriage, Mrs. Van Hoofs husband died, leaving a substantial estate. After Mr. Van Hoofs death, Mrs. Van Hoof hired Robert E. Burton, a financial advisor with Burton Associates, to provide her with investment advice and services.
In 1995, Mrs. Van Hoof, with Burton's assistance, opened an investment account that has been known throughout this litigation as "the Scudder account."[2] The account was opened solely in the name of Mrs. Van Hoofs daughter, Rowena, who lived with her;[3] it was funded with $100,000.
On nine separate occasions, spanning most of the time during which the account existed, Rowena withdrew funds from the Scudder account for her personal use. These withdrawals totaled $52,900.[4] On some occasions, Rowena asked Burton to assist her in withdrawing funds from the account; on other occasions, she obtained the funds without Burton's assistance. In a January 1997 letter to Burton in which she requested a withdrawal from the Scudder account, Rowena referred to the Scudder account as "my account." On a separate occasion, Rowena asked Burton to advise her as to whether she should withdraw funds from the Scudder account or from a different account in order to "buy" certain retirement benefits made available through her employer. Burton advised her to take money from the Scudder account to purchase the additional retirement benefits.
In 2000, Rowena was diagnosed with cancer. She died on November 1, 2002. At the time of her death, in addition to whatever interest she had in the assets held in the Scudder account, Rowena owned an individual retirement account *Page 282 
("the Lord Abbett IRA"), which she had funded personally, but as to which she had failed to name a beneficiary.
On or around October 22, 2002, about a week and a half before Rowena's death, Mrs. Van Hoof met with Burton at her house. Burton brought with him a chart showing the history of withdrawals from, and interest accruals in, the Scudder account. Mrs. Van Hoof directed Burton to liquidate the Scudder account. Later that day, Burton requested a check from the Scudder account in the amount of $100,000, the maximum amount that could be requested without a signature guaranty. The next day, he ordered a check for the remainder of the funds in the Scudder account, $1,042.63. The checks, which were mailed to Mrs. Van Hoofs house, were made payable to Rowena.
Burton went to Mrs. Van Hoofs house after the checks arrived. While he was there, Mrs. Van Hoof forged Rowena's endorsement on the $100,000 check from the Scudder account and then placed her own signature on the check, above a notation that the check was "for deposit only to Lord Abbett." The funds represented by the check funded a new account for Mrs. Van Hoof with an entity referred to in the record as "Lord Abbett."[5]
During this time, Burton also provided Mrs. Van Hoof with a beneficiary-designation form related to Rowena's Lord Abbett IRA (which, as noted, had been funded by Rowena but as to which no beneficiary had been named). Mrs. Van Hoof listed herself on the form as the beneficiary of Rowena's Lord Abbett IRA and forged Rowena's signature on the form. Neither Mrs. Van Hoof nor Burton discussed the transactions relating to the Lord Abbett IRA and the Scudder account with Rowena, despite the fact that she was lucid and alert until October 31, 2002, the day before she died[6]
After Rowena's death, Gaynell was appointed executrix of Rowena's estate. Gaynell was also the sole beneficiary under Rowena's will. On October 21, 2003, Gaynell filed the present lawsuit in her individual capacity and in her capacity as executrix of Rowena's estate. She alleged that both the Lord Abbett IRA and the Scudder account belonged to Rowena's estate and that the funds in those accounts had been wrongly transferred from Rowena or Rowena's estate.[7] After two amendments, Gaynell's complaint named the following individuals and entities as defendants: (1) Lord Abbett Funds, Lord Abbett All Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett U.S. Government Government Sponsored Enterprises Money Market Fund, Inc. (referred to hereinafter collectively as "Lord Abbett"); (2) Scudder Investments, Scudder Distributors, Inc., Scudder Investments Service Company, and Scudder Strategic Income Fund-A (collectively referred to herein as "Scudder");[8] (3) State Street Bank *Page 283 
Trust ("State Street"); (4) Burton; (5) Burton Associates; (6) Cadaret;[9] and (7) numerous fictitiously named defendants. Her complaint, also following amendment, included 13 counts: (1) breach of contract; (2) negligence; (3) wantonness; (4) fraud; (5) conversion of the Lord Abbett IRA; (6) conversion of the Scudder account; (7) payment of an instrument over an unauthorized signature; (8) breach of fiduciary duty; (9) conspiracy; (10) negligent or wanton hiring and supervision of Burton; (11) violation of Ala. Code 1975, § 8-6-17(a), with regard to the Scudder account; (12) violation of Ala. Code 1975, § 8-6-17(a), with regard to the Lord Abbett IRA; and (13) money had and received with regard to the Lord Abbett IRA.[10]
Following the filing of the complaint, on December 30, 2003, Mrs. Van Hoof wrote to Lord Abbett, stating, in pertinent part:
 "Any designation of me as the intended beneficiary on the [Lord Abbett IRA], and therefore the transfer to me, was erroneous. I hereby disclaim any right or interest in the [Lord Abbett IRA] and I hereby instruct Lord Abbett to reverse the transferring of the Lord Abbett IRA shares from the [Lord Abbett IRA] to [my] IRA account on an `as of basis, such that they will be treated as though they were never transferred from the [Lord Abbett IRA]."
Lord Abbett complied with this request. Thereafter, Gaynell requested that the Lord Abbett IRA be retitled in her name. Lord Abbett and State Street did so on October 29, 2004.
On August 13, 2004, Mrs. Van Hoof filed a motion to intervene in Gaynell's action. Her complaint in intervention alleged that she was the rightful owner of the proceeds of the Scudder account. She sought a declaratory judgment as to the ownership of those funds. On August 18, 2004, Lord Abbett and State Street filed a motion to interplead the funds derived from the Scudder account into the court. They also filed an answer to Gaynell's complaint and a counterclaim against Gaynell seeking indemnification for defending the action against them. On October 15, 2004, the trial court granted Mrs. Van Hoofs motion to intervene and Lord Abbett and State Street's motion to interplead the funds derived from the Scudder account.
On April 5, 2005, Lord Abbett and State Street filed a motion for a summary judgment in which they argued that they were "disinterested stakeholders" in a dispute that was, in essence, between mother and daughter. They asserted that the funds in the Lord Abbett IRA had already been returned to Rowena's estate and that the funds from the Scudder account, which was the only other account in dispute, had been interpleaded into the court and were awaiting determination by the court as to proper ownership. Therefore, they argued, there was no basis for the court to hold that Gaynell was entitled to recover damages against them.
On April 19, 2005, Cadaret, Burton, and Burton Associates filed a motion for a summary judgment. In addition to incorporating Lord Abbett and State Street's summary-judgment argument, they argued that, under Ala. Code 1975, § 6-5-462, the *Page 284 
tort claims alleged in the complaint did not survive Rowena's death.[11] They also argued that Gaynell could not pursue her individual claims because, at the time of the alleged acts or omissions giving rise to the complaint, she had no interest in or right to Rowena's property but was merely a beneficiary under Rowena's will. They argued that Rowena's estate was entitled to pursue only its breach-of-contract claim but could seek as damages for that claim only the amount of the funds that had already been paid into court. They argued that Gaynell could also pursue an equitable remedy on behalf of the estate, but, again, the remedy would be limited to the funds deposited in the court representing the Scudder account.
On May 24, 2005, Gaynell responded to both summary-judgment motions. As to Lord Abbett and State Street's motion, she argued that the two were not "disinterested stakeholders" but were, in fact, active wrongdoers. She asserted that her recovery of the interpleaded funds and her recovery of the Lord Abbett IRA would not make her whole but that, under all the counts in her complaint (except the one alleging money had and received), she was entitled to recover damages exceeding the funds from the Lord Abbett IRA and the Scudder account. She argued, for example, that under several of her counts, punitive damages, as well as consequential damages, were permitted.
As to Cadaret, Burton, and Burton Associates' summary-judgment motion, Gaynell incorporated her response to Lord Abbett and State Street's motion, and, in addition, asserted that her claims were not barred by Ala. Code 1975, § 6-5-462, because much of the tortious conduct giving rise to the cause of action did not occur until after Rowena's death. Thus, she argued, the claims she asserted survived Rowena's death.
On October 14, 2005, the trial court entered summary judgments in favor of Lord Abbett, State Street, Cadaret, Burton, and Burton Associates. The court's judgment did not make specific findings of fact.
On November 2, 2005, Gaynell moved for a summary judgment as to Lord Abbett and State Street's counterclaim. The record reflects that the trial court heard arguments by the parties on the motion on December 2, 2005, and that the trial court found, on January 6, 2006, that the motion was moot, though the record does not reflect the reason for this finding.[12]
Gaynell and Scudder entered into a pro tanto settlement agreement and, as part of their agreement, filed a stipulation of dismissal with prejudice of Gaynell's claims against Scudder. The trial court entered an order of dismissal with regard to the claims against Scudder on January 6, 2005. *Page 285 
On March 27, 2006, Gaynell filed a motion to strike her jury demand. She asserted that, because only her and Mrs. Van Hoofs claims to the deposited funds remained in the case (all the other claims having been dismissed or summarily disposed of) and because the remaining claim was equitable in nature, a jury trial was inappropriate. On March 31, 2006, the trial court granted the motion.
In April 2006, the trial court held a bench trial. At trial, Mrs. Van Hoof testified that she did not intend the Scudder account to be a gift to Rowena. She further testified that, before establishing the Scudder account, she explained to Rowena that the purpose for which she was creating the Scudder account was for her own (Mrs. Van Hoofs) care and so that she would not be a financial burden to Rowena or her other children. She testified that, on the day she signed the necessary paperwork to establish the Scudder account, Rowena was present and expressed her understanding of the purpose of the Scudder account.
Testimony at trial also indicated, however, that Rowena, and not Mrs. Van Hoof, reported the income from the Scudder account on her income-tax returns, a fact of which Mrs. Van Hoof was aware. Mrs. Van Hoof testified that she had paid Rowena for the tax liability Rowena incurred by declaring the income from the Scudder account on her tax returns. She also testified, however, that, although she had kept all of her canceled checks, the canceled checks indicating payments reimbursing Rowena for Rowena's additional tax liability were missing from her files.
Burton, who was present when the Scudder account was established, testified at trial that it did not appear to him that Mrs. Van Hoof was making a gift of the Scudder account to Rowena and that he would have considered it inappropriate for Rowena to withdraw funds from the Scudder account for her personal use. However, he also admitted that he had advised Rowena to withdraw money from the Scudder account to purchase retirement benefits. Burton admitted that such a use of funds from the Scudder account would not have been consistent with the idea that the Scudder account had been created solely for Mrs. Van Hoofs benefit and did not belong to Rowena.
Testimony at trial indicated that, both before and after she opened the Scudder account in Rowena's name, Mrs. Van Hoof opened 13 other accounts that she titled in both her and Rowena's names, jointly. The purpose of these joint accounts was to provide for Mrs. Van Hoof and to take care of her. She put Rowena's name on the joint accounts so that Rowena could sign checks on Mrs. Van Hoofs behalf should she be unable to do so.
The evidence also reflects that throughout the existence of the Scudder account, statements on the Scudder account were mailed to Mrs. Van Hoofs house, as were the withdrawal checks from the Scudder account that Rowena requested. Mrs. Van Hoof testified that only Rowena checked the mail at the house, and that when she asked Rowena about the account Rowena would respond that she should not worry about it and that she was handling it.
On April 14, 2006, the trial court entered a judgment in favor of Gaynell. The substantive portion of the trial court's order reads as follows:
 "This Court having heard and reviewed the evidence in this non-jury case and having applied the law to the facts, concludes that the funds which have been interplead[ed] into this Court in this matter, and are due to be paid to the Plaintiff, Gaynell M. Van Hoof, and it is hereby ORDERED, ADJUDGED and DECREED that the Clerk of the *Page 286 
Circuit Court is directed to disburse said funds to the Plaintiff. Each side to bear their own costs."
After the trial court denied Mrs. Van Hoofs postjudgment motion, Mrs. Van Hoof appealed; her appeal was docketed as appeal no. 1051221. Gaynell filed a cross-appeal as to the trial court's summary judgment in favor of Burton, Burton 
Associates, and Cadaret; that cross-appeal was docketed as appeal no. 1051432.
 II. Standard of Review
This case was tried without a jury. Where, as here, a trial court did not make specific findings of fact, this Court will assume the trial court made those findings necessary to support its judgment. Transamerica Commercial Fin. Corp. v. AmSouthBank, N.A., 608 So.2d 375, 378 (Ala. 1992). Moreover, "[w]here evidence is presented to the trial court oretenus, a presumption of correctness exists as to the court's conclusions on issues of fact. . . ." AmericanPetroleum Equipment Constr., Inc. v. Fancher,708 So.2d 129, 132 (Ala. 1997). "The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses." Hall v. Mazzone,486 So.2d 408, 410 (Ala. 1986). Indeed, "it is the function of the trial court, when acting as the finder of fact, to weigh the credibility of witnesses." Edwards v. Valentine,926 So.2d 315, 321 (Ala. 2005). Under the ore tenus rule of appellate review, this Court will affirm a trial court's judgment if there is substantial evidence of record supporting that judgment. B.D. Nelson Land Dev., Inc. v. Jackson,663 So.2d 932, 932 (Ala. 1995).
The presumption of correctness accorded a trial court's judgment following a bench trial does not extend to its decisions on questions of law. Instead, this Court reviews such rulings on questions of law de novo. Ex parte KeelboatConcepts, Inc., 938 So.2d 922, 925 (Ala. 2005); Exparte Graham, 702 So.2d 1215, 1221 (Ala. 1997).
As for our review of the summary judgment entered in favor of Burton, Burton Associates, and Cadaret, the standard we apply is well settled:
 "This Court reviews a summary judgment de novo. Turner v. Westhampton Court, L.L.C., 903 So.2d 82, 87 (Ala. 2004). We seek to determine whether the movant has made a prima facie showing that there exists no genuine issue of material fact and has demonstrated that the movant is entitled to a judgment as a matter of law. Turner, supra. In reviewing a summary judgment, this Court reviews the evidence in the light most favorable to the nonmovant. Turner, supra. Once the movant makes a prima facie showing that he is entitled to a summary judgment, the burden shifts to the nonmovant to produce `substantial evidence' creating a genuine issue of material fact. Ala. Code 1975, § 12-21-12; Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). `Substantial evidence' is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved. West v. Founders Life Assurance Co. of Fla., 547 So.2d 870, 871
(Ala. 1989)."
Muller v. Seeds, 919 So.2d 1174, 1176-77 (Ala. 2005). As is true with regard to a trial court's rulings on questions of law in the context of a bench trial, we review de novo questions of law arising in the context of a summary judgment.Smith v. State Farm Mut. Auto. Ins. Co.,952 So.2d 342, 346 (Ala. 2006). *Page 287 
 III. Mrs. Van Hoofs Appeal (appeal no. 1051221)
Mrs. Van Hoof contends that the trial court erred when it granted the motion to strike Gaynell's jury demand without first obtaining Mrs. Van Hoofs consent. She cites Rule 38(d), Ala. R. Civ. P., which provides, in pertinent part, that "[a] demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties. . . ."
Gaynell responds that Mrs. Van Hoof was not entitled to a jury trial because Mrs. Van Hoofs only claim to the funds from the Scudder account that had been titled in Rowena's name rested on a trust theory and was equitable in nature. Gaynell points out that Rule 39(a), Ala. R. Civ. P., provides, in pertinent part, that "[t]he trial of all issues so demanded shall be by jury, unless . . . the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or the statutes of this state."
In reply, Mrs. Van Hoof asserts that § 6-6-228, Ala. Code 1975 (a part of the Declaratory Judgment Act, § 6-6-220et seq., Ala. Code 1975), provides that when a declaratory-judgment action involves the determination of an issue of fact, "such issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." She also asserts that "one `seeking a declaratory judgment is entitled to a jury trial as a matter of right if he would have had such a right in the cause of action for which the declaratory relief may be considered a substitute.'" (QuotingSherer v. Burton, 393 So.2d 991, 991 (Ala. 1981).) She argues that her declaratory-judgment action may be considered a substitute for other legal claims, including conversion, intentional interference with business relations, negligence, and wantonness, for which she was entitled to a jury trial. Finally, she argues that, even if her claim is equitable, the trial court had the discretionary authority to allow a jury trial under Rule 39, Ala. R. Civ. P.
This Court has stated that the Rules of Civil Procedure "should not be construed to permit a jury trial on issues which were never triable by jury before the adoption of the Rules. . . ." ExparteCollins, 394 So.2d 952, 954 (Ala. 1981). Thus, Rule 38(d), on which Mrs. Van Hoof relies, cannot be construed to require a jury trial on an equitable claim for which a jury trial was not historically permitted, even if a jury trial was previously demanded and not all the parties in the action consent to the withdrawal of that jury demand. To hold otherwise would be to require a jury trial on an issue that was "never triable by jury before the adoption" of Rule 38(d).
Furthermore, the language in Rule 39(a), on which Gaynell relies, informs the proper application of Rule 38(d). That section provides:
 "When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or (2) the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of this state."
Item (1) appears to contemplate the situation provided for in Rule 38(d), wherein all of the parties must consent to the with *Page 288 
drawal of a jury demand. Item (2), however, provides the trial court with the authority, either on the motion of a party or sua sponte, to deny a jury trial of issues for which a right to a jury trial does not exist. To read Rule 38(d) as Mrs. Van Hoof suggests would inappropriately restrict the trial court's use of this authority and would result in the trial by jury of cases in a manner that the rules, when considered together, do not contemplate. Thus, Mrs. Van Hoofs reliance on Rule 38(d) is misplaced.
We turn then to Mrs. Van Hoofs argument that her declaratory-judgment action may be considered a substitute for a legal claim for which a jury trial was historically available and therefore that she was entitled to a jury trial as a matter of right.[13] The rule upon which Mrs. Van Hoofs argument is presented is correct: a party" `seeking a declaratory judgment is entitled to a jury trial as a matter of right if he would have had such a right in the cause of action for which the declaratory relief may be considered a substitute."' Shererv. Burton, 393 So.2d at 991 (quoting Hanks v.Hanks, 281 Ala. 92, 97, 199 So.2d 169, 173 (1967)). Mrs. Van Hoof argues that the declaratory relief she seeks is a substitute for various tort claims she has against Gaynell. We disagree.
The relief Mrs. Van Hoof sought through her declaratory-judgment action was a declaration as to the rightful owner of the funds in the Scudder account, which were interpleaded into the court. It is undisputed that, in 1995, Mrs. Van Hoof placed the principal amount of $100,000 in that account and titled that account in Rowena's name only; all principal and earnings thereon, less the withdrawals made by Rowena herself, remained in that account, titled solely in Rowena's name, until her death. If Mrs. Van Hoof sought to be declared the true owner of those funds, it was on the ground that they had been held in trust for her by Rowena.
The recognition and enforcement of a trust as to the funds at issue would be equitable in nature. See Lowrey v.McNeel, 773 So.2d 449, 453 (Ala. 2000) ("'"[T]he regulation and enforcement of trusts is one of the original and inherent powers of the equity court."'" (quoting ExparteHolt, 599 So.2d 12, 14 (Ala. 1992), quoting in turnFirst Alabama Bank of Montgomery, N.A. v. Martin,425 So.2d 415, 423 (Ala. 1982))); Matthews v. Matthews,292 Ala. 1, 8, 288 So.2d 110, 116 (1973) (" `A resulting trust, the holding of title by one with beneficial ownership in another, is a creature of equity, based upon the prima facie presumption that he who pays the whole or an aliquot part of the purchase price for lands becomes the beneficial owner.'" (quotingJ.A. Owens Co. v. Blanks, 225 Ala. 566, 567,144 So. 35, 36 (1932))). "It is . . . well settled that the constitution does not provide a right to a jury trial for the resolution of factual issues for parties alleging equitable claims." Wootten v. Ivey, 877 So.2d 585, 588 (Ala. 2003). Specifically with regard to trusts, this Court has stated that "[t]here is no right to a jury trial on the issue of the existence or nonexistence of a trust." ExparteDavis, 465 So.2d 392, 394 (Ala. 1985) (stating that the trial judge is to determine whether an express, constructive, or resulting trust exists).
Mrs. Van Hoof argues that, even if her claim is equitable, rather than legal, "a jury trial under the declaratory judgment statute is still permissive." Though she cites cases for this proposition, she fails to *Page 289 
explain how the fact that it may have beenpermissible for the trial court to impanel a jury, advisory or otherwise, in this case required the court to do so. She has failed to demonstrate error by the trial court in this regard.
Mrs. Van Hoof next contends that the evidence before the trial court did not support its judgment in Gaynell's favor. In this regard, she cites Herbert v. Haggermaker,53 Ala.App. 15, 296 So.2d 915 (1974), for the proposition that, "[i]n order to determine whether a gift inter vivos was made by the deceased, . . . three requirements must be met, (1) an intention by the donor to make a gift, (2) delivery of the property to the donee, and (3) acceptance by the donee."53 Ala.App. at 18, 296 So.2d at 917. Citing, among other cases,Collins v. Baxter, 231 Ala. 247, 164 So. 61 (1935), she argues that Gaynell, in order to prevail, was required to prove all three of these requirements by clear and convincing evidence, but that she did not do so.
The legal premise for Mrs. Van Hoofs argument, though a correct principle of law, is not the principle that controls in this case. When one person pays the purchase price for property and places title to the property in the name of another, the law generally presumes a resulting trust on the property in favor of the party who paid the purchase price. See Taylor v.First Nat'l Bank of Tuskaloosa, 279 Ala. 624, 635,189 So.2d 141, 150 (1966). A contrary presumption applies, however, where, as here, the person who pays the purchase price places title to the property purchased in the name of his or her child. See id. It is undisputed in this case that the Scudder account was purchased with Mrs. Van Hoofs money but placed in the name of Rowena, her daughter.
In Taylor, this Court discussed the law that applies in cases, such as the one be-fore us, where a person provides funding to purchase property that is placed in the name of the person's child or spouse:
 "We come to consider the rules as to presumption for or against the creation of a trust when one person pays the purchase price and takes title in the name of another.
 "`An exception to the rule that the law will presume a trust on the legal estate in favor of one who pays the purchase money of land, [14] the title to which is taken in the name of another, exists where a parent or husband furnishes the purchase money, and the title is taken in the name of his child or wife. In such case the presumption of intention to become the owner of the property arising from the payment of the purchase money is rebutted by the stronger counter presumption of an intention to make an advancement to the child or wife. Hence the presumption of such a trust does not arise from the mere fact that the purchase money is supplied by the parent, and the conveyance is taken in the name of a son. Hatton v. Landman, 28 Ala. 135 [(1856)]. When, therefore, such relationship between the parties is shown by the averments of the bill, the presumption arising therefrom must be clearly rebutted by appropriate allegations. . . .' Long v. King, 117 Ala. *Page 290 
 423, 430, 431, 23 So. 534, 536 [(1898)].
 "`It is well settled that: "Where a person who purchases land in the name of another and pays the consideration money himself, is under a natural or moral obligation to provide for the person in whose name the conveyance is taken, such as the wife or child, no presumption of resulting trust arises, but the transaction will be treated prima facie as an advancement for the benefit of the nominal purchaser. The inference which the law permits to be drawn in this class of cases is based on the common knowledge and experience of mankind in regard to the motive that usually accompanies transactions of this character." 26 R.C.L. 1225, § 71, and authorities cited under notes 8 and 9.
 "`. . . .
 "`§ 164. It is further to be observed that voluntary conveyances to a wife or child were never within the rule that such gifts raised a resulting trust for the donor. In conveyances of this kind to the donor's family the analogy of the common law was followed, whereby, if a feoffment was made to a stranger without consideration, a use resulted to the feoffor; but if a feoffment was made to a wife or child, no use resulted, for the consideration of blood was held a good consideration, and an advance or settlement was presumed. . . .' (Perry on Trusts, [(5th ed. 1899)], at pages 222 and 223)."
279 Ala. at 635-36, 189 So.2d at 150-52.
In Montgomery v. McNutt, 214 Ala. 692, 108 So. 752
(1926), this Court stated:
 "`In trusts . . . between family relatives, no evidence is necessary, in the first instance, to show the operation of the rule, since a presumption arises on the face of the transaction that a gift was intended, and that no trust results. This result, however, is merely a presumption, and may be overcome. Extrinsic evidence, either written or parol, is admissible on behalf of the husband or parent paying the price to rebut the presumption of an advancement or gift, and to show that a trust results; and, conversely, such evidence may be used to fortify and sup-port the presumption. In general, this extrinsic evidence, to defeat an advancement and establish a trust as against the party to whom the property is conveyed or transferred and those holding under him, must consist of matters substantially contemporaneous with the purchase, conveyance, or transfer, so as to be fairly connected with the transaction.'
 "Where the purchase price is paid by husband or father out of his own funds, and conveyance taken in the name of wife or child, the presumption is that a gift or advancement is intended. This presumption may be overcome by proof that no gift or advancement was intended. This also, according to the authorities, must be clearly and convincingly shown in such cases. It is the intention of the parties in such cases that must control, and what that intention was may be the subject of proof.
 ". . . .
 "The presumption in favor of wife or child is founded in natural affection and moral obligation (Story's Eq. [14th Ed.] § 1601) and the authorities seem to extend it to all cases in which the purchaser who pays the price is under legal or moral obligation to provide for the grantee (Story's Eq. [14th Ed.] § 1601, note 3)."
214 Ala. at 694-95,108 So. at 754.[15] *Page 291 
Based on the foregoing presumptions and our review of the evidence, we conclude that the trial court reasonably could have found that the Scudder account was not held by Rowena in trust for Mrs. Van Hoof, but, instead, was a gift from Mrs. Van Hoof to Rowena.
In her brief, Mrs. Van Hoof argues that
 "[t]o uphold the trial court's ruling, this Court must totally disregard the testimony of [Mrs. Van Hoof,] who testified specifically that the Scudder Account was created for her benefit and was not a gift to Rowena; it must disregard the testimony of the financial advisor, Robert Burton, who assisted in establishing this account and who likewise testified that this account was for the benefit of [Mrs. Van Hoof] and not intended as a gift to Rowena; it must disregard [Gaynell]'s own expert witness, Robert Crow, CPA, who testified that based on his thirty (30) years in the accounting field, the IRS would not have considered the arrangement between [Mrs. Van Hoof] and Rowena with regard to the [Scudder account] to have been a gift;[16] and, even more, it must disregard [Gaynell]'s own testimony that she has no information whatsoever concerning this Account and no information whatsoever to rebut the testimony of [Mrs. Van Hoof] and Robert Burton, who were both present when the Account was opened. [Mrs. Van Hoof] firmly believes that, in simplest terms, [Gaynell] did not make her case."
We disagree. In order to make its findings, the trial court did not have to "disregard" any of the above-referenced evidence. The trial court could have found some or all the testimony on behalf of Mrs. Van Hoof to be not credible or to be entitled to less weight than the conflicting testimony, circumstances, and other evidence supporting Gaynell's position. In spite of the testimony on which Mrs. Van Hoof relies, the record does in fact contain substantial countervailing evidence that supports the trial court's finding that the Scudder account was a gift from Mrs. Van Hoof to Rowena.
First, Mrs. Van Hoof placed the account solely in Rowena's name. In so doing, Mrs. Van Hoof gave Rowena complete and unfettered control of the account and prevented *Page 292 
herself from accessing the account by any means short of filing a legal action or forging Rowena's signature.
Second, Mrs. Van Hoof never reviewed the account to determine how it was performing. The fact that she allegedly did not check her mail and, as a result, did not receive any of the account statements that were sent to her house would not have prevented her from following up with Burton as to how the account was performing.
Third, more than seven years passed from the date of the establishment of the Scudder account until Rowena's death. During this time, Mrs. Van Hoof took no action that could be construed as asserting control over the Scudder account until she sought its liquidation a few days before Rowena's death.
Fourth, Rowena, not Mrs. Van Hoof, declared the income from the Scudder account on her income-tax returns. Although Mrs. Van Hoof testified that she paid Rowena the difference in Rowena's tax liability that resulted from claiming the income from the Scudder account on her income-tax returns, when asked whether she had any proof of this, Mrs. Van Hoof said that, although she kept all of her canceled checks, the particular canceled checks she had written to Rowena to cover this additional tax liability were missing from her files.
Fifth, in order to take control of the funds in the Scudder account, Mrs. Van Hoof forged Rowena's name on two checks representing the balance of the account instead of talking to Rowena and asking Rowena to request the liquidation of the Scudder account. The trial court could infer from this fact that Mrs. Van Hoof knew that Rowena would object to liquidating the account because it was her asset and not Mrs. Van Hoofs.[17]
Finally, Rowena was named only as a joint signatory on numerous other accounts opened by Mrs. Van Hoof in both her name and Rowena's. When asked why she treated the Scudder account differently by opening it solely in Rowena's name rather than simply making Rowena a joint signatory on the account as she had with her other accounts, Mrs. Van Hoof failed to provide a rational explanation.
Mrs. Van Hoofs testimony regarding the creation of the Scudder account was very detailed and particular as to her conversations with Rowena and Burton about the purpose of the account. Such detailed testimony stood in stark contrast with her inability to recall details related to other accounts she had established and transactions in which she had engaged both before and after the creation of the Scudder account. Mrs. Van Hoof also testified on two separate occasions that she had never previously testified at a court proceeding. On cross-examination, however, she admitted that she had, in fact, previously testified in court.
Just as the trial court was entitled to disbelieve Mrs. Van Hoofs testimony, the trial court was not obligated to give as much weight to Burton's testimony as Mrs. Van Hoof would have liked. Burton testified that the purpose of the Scudder account *Page 293 
was solely to care for Mrs. Van Hoof and that Rowena understood that that was the purpose of the account. In 2000, however, when Rowena asked his advice as to which of two accounts (the Scudder account or a personal IRA) from which she should draw funds to purchase time from her employer that would be credited toward her retirement, he advised her to withdraw the funds from the Scudder account. Burton admitted that such advice ran counter to the understanding of the purpose of the Scudder account he asserted at trial. The conflict between his advice to Rowena in 2000 and his trial testimony provided a sufficient basis on which the trial court could doubt Burton's testimony on this point.
The trial court likewise was entitled to discount the testimony of Lynda Van Hoof, another of Mrs. Van Hoofs daughters, who testified that, before the Scudder account was opened, Mrs. Van Hoof discussed with her the need to open it and that together they decided that it would be best to place Rowena's name on the account because she lived with Mrs. Van Hoof. Contrary to Lynda's testimony, however, Mrs. Van Hoof testified unequivocally that she did not discuss with any of her children, besides Rowena, the fact that she was opening the Scudder account until some time after she had opened the account. The trial court thus could disregard Lynda's conflicting testimony.
As noted, we assume the trial court made those findings necessary to support its judgment, Transamerica CommercialFin. Corp., 608 So.2d at 378, and, because this was an ore tenus proceeding, "a presumption of correctness exists as to the court's conclusions on issues of fact," AmericanPetroleum Equipment Constr., Inc., 708 So.2d at 132. Considering the applicable legal presumption and the above-described evidence, and recognizing that the trial judge, as the finder of fact, was free to make determinations as to the credibility to be assigned to the testimony of the various witnesses and the relative weight to be assigned to that testimony, see Edwards v. Valentine, 926 So.2d 315,321 (Ala. 2005), and to the circumstances and other evidence of record, the trial court reasonably could have found that Mrs. Van Hoof intended to make a gift of the Scudder account to Rowena and did not intend to create a resulting trust on the assets of that account for Mrs. Van Hoofs benefit and use. As a result, the trial court's judgment in Gaynell's favor is due to be affirmed.
 IV. Gaynell's Cross-Appeal (appeal no. 1051432)
Gaynell's complaint asserted claims on her own behalf, as well as on behalf of Rowena's estate, relating to both the Lord Abbett IRA and the Scudder account. In her cross-appeal, Gaynell contends that the trial court erred when it entered a summary judgment in favor of Burton, Burton Associates, and Cadaret (hereinafter referred to collectively as "the Cadaret defendants") on all of these claims. We conclude that the summary judgment is due to be affirmed as to some of these claims and reversed as to others.
A. Gaynell's Personal Claims
As explained more fully below, at the time the causes of action at issue in this cross-appeal accrued, the Lord Abbett IRA and the Scudder account belonged either to Rowena or to Rowena's estate. Gaynell contends on appeal, however, that, as a beneficiary of Rowena's will, she "had sufficient interest in the funds to bring her claims individually."
This Court has stated that "the general rule is that personal assets are recoverable only by the personal representative." *Page 294 Cook v. Parker, 248 Ala. 393, 395, 27 So.2d 779,781 (1946). That is, as a general rule, "[n]either legatees nor distributees can maintain suits concerning [personal assets], though when recovered the personal representative holds them in trust for their ultimate benefit." Id. See also
Ala. Code 1975, §§ 43-2-830, 43-2-837 (authorizing a personal representatives to bring a civil action "to recover possession of property or to determine the title thereto"), and 43-2-839.
Gaynell does not argue that she falls within any exception to the general rule. Compare Cook v. Parker,248 Ala. at 395, 27 So.2d at 781 (explaining an exception applicable "[w]hen an estate is left entirely free from debt, and the distributees do not invoke the action of the probate court to separate their several interests, but ask an equity court to give them their respective shares, without the expense and delay of an administration"); and Gunter v. Gunter,911 So.2d 704 (Ala.Civ.App. 2005) (allowing intervention, in a lawsuit, of a legatee under a will, where the executor had his own personal interest in the property at issue and had not moved to intervene in the lawsuit in his capacity as executor, and the court, citing Rule 24(a), Ala. R. Civ. P., concluded that the beneficiary's "interest as to the property [was] not `adequately represented by existing parties'").
The only element of damage Gaynell alleged in her complaint that even arguably could be construed as arising from a wrong done to her personally, rather than to Rowena or the estate, relates to a delay that occurred in the titling of the Lord Abbett IRA in her name individually after Lord Abbett had retitled the IRA in the name of Rowena's estate. This claim, alleging as it does wrongdoing in Lord Abbett's delay, has not been shown to implicate the Cadaret defendants and, as a result, provides no basis to defeat a summary judgment against Gaynell on the claims she alleged in her personal capacity against the Cadaret defendants.
B. The Estate's Securities-Act Claims (Counts 11 and 12)
In her complaint, Gaynell also asserted that the Cadaret defendants violated § 8-6-17(a), Ala. Code 1975, a part of the Alabama Securities Act, Ala. Code 1975, § 8-6-1 etseq. ("the Securities Act"); § 8-6-17(a) provides:
 "(a) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to:
 "(1) Employ any device, scheme, or artifice to defraud;
 "(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 "(3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."
(Emphasis added.) The civil remedy provided by the Securities Act is found at § 8-6-19, which provides, in pertinent part:
 "(a) Any person who:
 "(1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or of any condition imposed under this article, or
 "(2) Sells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the *Page 295 
buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission,
 "is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at six percent per year from the date of payment, court costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six percent per year from the date of disposition.
 "(b)(1) Any person who engages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities in violation of subsection (b), (c), (d), (e), or (f) of Section 8-6-17, subsection (b) or (c) of Section 8-6-3, Section 8-6-14, is liable to that person, who may bring an action to recover the consideration paid for such advice and any loss due to such advice, together with interest at six percent per year from the date of payment of the consideration plus costs and reasonable attorney's fees, less the amount of any income received from such advice.
 ". . . .
 "(2) Any person who receives . . . any consideration from another person for advice as to the value of securities or their purchase or sale . . . and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice, or course of business which operates or would operate as a fraud or deceit on such other person, is liable to that person, who may bring an action to recover the consideration paid for such advice and any loss due to such advice, together with interest at six percent per year from the date of payment of the consideration plus costs and reasonable attorney's fees, less the amount of any income received from such advice."
(Emphasis added.)
The theory of Gaynell's cause of action is that the defendants wrongfully took and withheld from Rowena or her estate the assets of the Lord Abbett IRA and of the Scudder account. Gaynell did not assert any claims by which she sought to recover consideration that Rowena paid for a security that was "offered" or "sold" to Rowena in violation of the Securities Act. Furthermore, Gaynell did not assert claims by which she sought to recover consideration that Rowena paid for advice that violated the Securities Act, or any loss Rowena or the estate suffered due to any such advice.
Gaynell's claims do not arise under the Securities Act. As a result, the trial court did not err when it entered a summary judgment on those claims.
C. Survival of the Estate's Other Tort Claims
In their summary-judgment motion, the Cadaret defendants argued that the estate's tort claims were barred by § 6-6-462, Ala. Code 1975, because, according to them, those claims accrued before Rowena died. Section 6-6-462 provides: *Page 296 
 "In all proceedings not of an equitable nature, all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives; and all personal claims upon which no action has been filed survive against the personal representative of a deceased tortfeasor."
Thus, as to tort claims accruing before the death of the would-be plaintiff, "[t]he general rule is that under Ala. Code 1975, § 6-5-462, an unfiled tort claim does not survive the death of the person with the claim." Malcolm v. King,686 So.2d 231, 236 (Ala. 1996).
Gaynell contends that the tort claims she filed on behalf of Rowena's estate with regard to the Lord Abbett IRA survived Rowena's death because, she says, injury did not occur, and thus the claims did not accrue (see City of Birmingham v.Leberte, 773 So.2d 440, 444 n. 1 (Ala. 2000)), during Rowena's life. Instead, according to Gaynell, actual injury occurred after Rowena's death when Mrs. Van Hoof made her claim as the beneficiary of the account in February 2003 and the account was transferred to her, and again when, following Mrs. Van Hoofs eventual disclaimer of the proceeds of the account, Lord Abbett for a period of time "refused to transfer the [Lord Abbett] IRA or allow Gaynell to access the funds."
In the trial court, however, Gaynell asserted in response to the Cadaret defendants' summary-judgment motion that injury from naming Mrs. Van Hoof as the beneficiary of the Lord Abbett IRA via the forged designation-of-beneficiary form occurred, at least in part, "at the time of the forged beneficiary designation, before the death of Rowena A. Van Hoof." (Gaynell argued to the trial court that additional injuries regarding the Lord Abbett IRA occurred after Rowena's death as well.) A cause of action accrues at the time the complained-of action first gives rise to injury, even if the full extent of the injury is not apparent at the time. See Leberte,773 So.2d at 444 n. 1.
Because Gaynell's representations to the trial court indicated that the tort claims she filed on behalf of the estate with regard to the Lord Abbett IRA accrued before Rowena died, she invited the trial court to conclude that those claims did not survive Rowena's death but, instead, were barred by § 6-5-462. Gaynell cannot now argue that those claims related to the Lord Abbett IRA accrued only after Rowena died and therefore survived her death. See Mobile Infirmary Med.Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala. 2003) ("The law is well settled that a party may not induce an error by the trial court and then attempt to win a reversal based on that error. `A party may not predicate an argument for reversal on "invited error," that is, "error into which he has led or lulled the trial court."'").
As to the Scudder account, however, we conclude that the trial court did err to reversal in entering a summary judgment against the estate on its non-Securities-Act tort claims. Summary judgment was not appropriate on the basis of § 6-5-462 with regard to those claims as they relate to the Scudder account. Although the record reflects that two checks representing the entire amount of the Scudder account were drawn on the Scudder account before Rowena's death, the record is not clear as to when those checks were paid and the funds they represented actually withdrawn from the Scudder account, such that Rowena or her estate actually suffered injury.See Blair v. Davis, 281 So.2d 247, 248-49
(Fla.Dist.Ct.App. 1973). *Page 297 
Thus, the record does not disclose whether the Cadaret defendants' actions regarding the Scudder account resulted in injury before or after Rowena's death, and, as a result, a genuine issue of material fact remains as to whether the causes of action related to the Scudder account accrued before or after Rowena's death.
The bar contained in § 6-5-462 is an affirmative defense because it is a "defense that raises a new matter and that would be a defense even if the relevant allegations in the plaintiffs complaint were true." See Patterson v. LibertyNat'l Life Ins. Co., 903 So.2d 769, 779 (Ala. 2004). Because it was an affirmative defense, the Cadaret defendants were required to present substantial evidence in support of it in order to be entitled to a summary judgment based thereon.See Exparte General Motors Corp., 769 So.2d 903, 909
(Ala. 1999). The fact that the record does not disclose when the cause of action related to the Scudder account accrued indicates that the Cadaret defendants failed to do so. The summary judgment therefore was not appropriate as to the causes of action related to the Scudder account on the basis of the Cadaret defendants' § 6-5-462 argument.
D. Damages
In their summary-judgment motion, the Cadaret defendants incorporated the following argument from the summary-judgment motion of State Street and Lord Abbett:
 "[Gaynell] has disclaimed entitlement to damages for mental anguish. She has full possession, title and control over the [Lord Abbett] IRA account. If she is adjudged entitled to the funds on deposit with the Court she obviously cannot claim damage as a result of the loss of those funds. If the Court awards the funds to Mrs. Van Hoof then she just as obviously has no claim for damages for the loss of such funds."[18]
Gaynell argues on appeal, however, that neither the fact that the Lord Abbett IRA was turned over to her two years following Rowena's death nor the fact that the proceeds of the Scudder account eventually were interpleaded undoes the alleged breach of contract or the alleged commission of torts against Rowena and the estate. She quotes National States Insurance Co.v. Jones, 393 So.2d 1361 (Ala. 1980), a case in which this Court held that the defendant's return of insurance premiums did not undo the fact that a fraud had been perpetrated:
 "Clearly, one cannot rectify a fraud by subsequent conduct. Once the fraud is perpetrated, a cause of action has accrued and the rescission of the contract does not cause the plaintiff to forfeit his cause of action in tort."
393 So.2d at 1367.
Gaynell also argues that the causes of action alleged by her against the defendants allow for recovery of damages in addition to the amount of the Lord Abbett IRA or the amount of the interpleaded proceeds from the Scudder account. She contends that she has suffered damage in the loss of use of those funds, as well as in the form of taxes and accountants' fees incurred as a result of the wrongful acts of the Cadaret defendants. She further argues that she may be entitled to punitive damages under some of her claims. Gaynell's quotation from National States Insurance Co. continues as follows: *Page 298 
 "Appellants again look to the premium refund as basis for their argument saying here that a refund negated any possibility of damage to Plaintiff. We do not agree. Plaintiff suffered actual damage in several respects. She lost the time value of the money paid in premiums; she lost the opportunity to obtain other coverage by relying on the protection of these policies; and she incurred out-of-pocket expenses for items which had been represented to her as covered by these policies. Such a refund could only be considered in mitigation of damages."
393 So.2d at 1367-68.
We agree that the return of the proceeds of the Lord Abbett IRA and the interpleading of the proceeds from the Scudder account do not eliminate such causes of action as may have accrued in relation to the wrongful taking of those assets in the first place. See Brown v. Campbell, 536 So.2d 920, 921
(Ala. 1988) (holding that return of allegedly converted property before trial did not preclude the conversion action);Pihakis v. Cottrell, 286 Ala. 579, 586-87,243 So.2d 685, 692 (1971). We also agree that the law generally allows for the recovery of all damages, including incidental and consequential, caused by the breach of contract or the commission of a tort. See Exparte Steadman,812 So.2d 290, 295 (Ala. 2001) (" `The general rule as to the measure of damages in breach of contract cases is that damages are recoverable which are the natural and proximate consequence of the breach, and it is that sum which would place the injured party in the same condition he would have occupied if the contract had not been breached.'" (quoting Brendle FireEquip., Inc. v. Electronic Eng'rs, Inc., 454 So.2d 1032,1034 (Ala.Civ.App. 1984))); Continental Eagle Corp. v.Mokrzycki, 611 So.2d 313, 320 (Ala. 1992) ("General tort law permits recovery of all damages proximately caused by the wrongful acts of the defendant."). In addition, assuming a proper evidentiary showing on remand, punitive damages may be recoverable under one or more of the tort claims that have been brought. Consequently, the Cadaret defendants were not entitled to a summary judgment merely because the proceeds of the Lord Abbett IRA were returned and the proceeds of the Scudder account inter-pleaded.[19]
 V. Conclusion
Based on the foregoing, we affirm the judgment of the trial court in appeal no. 1051221. In the cross-appeal, appeal no. 1051432, we affirm the trial court's summary judgment in favor of the Cadaret defendants and against Gaynell in her personal capacity and the summary judgment in favor of the Cadaret defendants and against Rowena's estate as to non-Securities-Act tort claims related to the Lord Abbett IRA and violations of the Securities Act (counts 11 and 12). We reverse the summary judgment in favor of the Cadaret defendants and against Rowena's estate as to the remaining claims at issue in the cross-appeal, and we remand the case for further proceedings consistent with this opinion.
1051221 — AFFIRMED.
1051432 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SEE, LYONS, WOODALL, STUART, SMITH, BOLIN, and PARKER, JJ., concur.
[1] The trial court and the parties treated Burton 
Associates as a separate legal entity; the complaint identifies Burton Associates as a corporation.
[2] "Scudder" refers to the name of the company providing the fund management for the account. The record reflects that manage-ment of the fund changed on at least two occasions, so that, at certain points, the Scudder account was actually managed by a company referenced in the record as "Kemper" or by a company referenced in the record as "Zurich."
[3] Indeed, the record reflects that, for all of her life except for one year, Rowena lived with Mrs. Van Hoof.
[4] Mrs. Van Hoof testified at trial that, until shortly before Rowena's death, she had no knowledge that Rowena had been making withdrawals from the Scudder account.
[5] The pleadings in this action designate four "Lord Abbett" entities: Lord Abbett Funds, Lord Abbett All Value Fund, Lord Abbett Bond-Debenture Fund, Inc., and Lord Abbett U.S. Government Government Sponsored Enterprises Money Market Fund, Inc. The record is not clear as to whether Lord Abbett Funds and Lord Abbett All Value Fund were corporations or some other form of legal entity.
[6] Indeed, Rowena continued working until the week before she died.
[7] Rowena had a second IRA, the proceeds of which were received by Mrs. Van Hoof, as beneficiary, upon Rowena's death. Mrs. Van Hoof also was a co-owner with Rowena of an annuity that Mrs. Van Hoof had funded and that she received on Rowena's death. Gaynell did not contest Mrs. Van Hoof's entitlement to the funds in these accounts.
[8] The record is not clear as to whether Scudder Investments and Scudder Strategic Income Fund-A were corporations or some other form of legal entity.
[9] Burton was affiliated with Cadaret, a New York-based broker dealer.
[10] Gaynell asserted count 13 against only Lord Abbett. Although the complaint indicates that she asserted count 7 against all the defendants, including Cadaret, Burton, and Burton Associates, she states on appeal that she did not assert that claim against those defendants and does not pursue it as to them.
[11] Ala. Code 1975, § 6-5-62, provides: "In all proceedings not of an equitable nature, all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives; and all personal claims upon which no action has been filed survive against the personal representative of a deceased tortfeasor."
[12] The counterclaim actually appears to have been withdrawn, though the record is not clear in this regard. On March 31, 2006, Gaynell, Lord Abbett, and State Street filed a joint motion to dismiss their claims against each other with prejudice. The record does not reflect that the trial court ruled on this motion. To the extent that the counterclaim remained viable after the motion was filed, however, it was effectively abandoned when Lord Abbett and State Street did not present their counterclaim at the trial of this case.
[13] In her appeal in this case, Mrs. Van Hoof does not argue that any claim Gaynell had to the Scudder account entitled Mrs. Van Hoof to a jury trial.
[14] Although Taylor speaks of a resulting trust in terms of real property, this Court has recognized that personal property can also be the subject of a resulting trust. SeeFerryman v. Pugh, 269 Ala. 487, 493, 114 So.2d 253, 259
(1959) ("The doctrine of resulting trusts applies alike to realty and personalty."); Mandelcorn v. Mandelcorn,228 Ala. 590, 593, 154 So. 909, 911 (1934).
[15] In Cone v. Cone, 331 So.2d 656 (Ala. 1976), this Court held that the facts before it did not present a resulting-trust situation. Nevertheless, it analyzed the facts under the rules of law applicable to resulting trusts, stating as follows:
 "[E]ven where there are circumstances under which a resulting trust would normally arise, if the property has been paid for by a husband but title has been taken in his wife's name, then `equity takes the position that the normal reasonably inferred intent . . . is an intent to make a gift to the wife.' Bogert, Trusts Trustees, § 459, at 579 (2d ed. 1964)."
331 So.2d at 658. See also Sykes v. Sykes,262 Ala. 277, 280, 78 So.2d 273, 275-76 (1954) ("[W]here a husband or parent pays the purchase price for land and causes title thereto to be taken in the name of his wife or child, the presumption of intention to become the own-er of the property arising from the payment of the purchase money is rebutted by the stronger counter presumption of an intention to make an advancement or gift to the wife or child. . . . `When, therefore, such relationship between the parties is shown by the averments of the bill, the presumption arising therefrom must be clearly rebutted by appropriate allegations.'").
[16] Crow's testimony in this regard was based on a hypothetical question posed by Mrs. Van Hoof's attorney in which Crow was asked to assume that Mrs. Van Hoof "created th[e] Scudder account with her funds to be used for her benefit in her old age in case she needed it for medical expenses or for any other expenses." The trial court could have found Crow's testimony to be of little value in deciding the ultimate question before it, since it assumed an answer to that question.
[17] Although Mrs. Van Hoof stated that the reason she forged Rowena's signature rather than talking to her about liquidating the Scudder account was that she was fearful that it would offend Rowena, this explanation could have been deemed suspect by the trial court. The trial court could have concluded that, if the purpose of the Scudder account was to take care of Mrs. Van Hoof, and Rowena understood this purpose, it makes no sense that Mrs. Van Hoof could not have discussed the Scudder account with Rowena, especially given that Mrs. Van Hoof requested the liquidation of the Scudder account during a week that Rowena was still going to work.
[18] Unlike the tort claims, lack of damages was the only basis for summary judgment asserted to the trial court by the Cadaret defendants with respect to the estate's breach- of-contract claim. In the their summary-judgment motion, the Cadaret defendants did not challenge the existence of a contract with Rowena, or the allegation of a breach thereof.
[19] We find the remaining arguments made by mary judgment in their favor on appeal to be the Cadaret defendants to sustain the sum-without merit. *Page 299